*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIE TERRELL CLEMONS,

        Defendant-Appellant.

UNPUBLISHED
December 17, 2020

No. 347225
Kent Circuit Court
LC No. 95-003103-FC

Before: FORT HOOD, P.J., and SAWYER and SERVITTO, JJ.

PER CURIAM.

In 1996, defendant, Willie Terrell Clemons, was convicted as a juvenile of first-degree murder committed in perpetration of a robbery (felony murder), MCL 750.316(1)(b); and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1). Defendant was sentenced to a mandatory life sentence without the possibility of parole for his first-degree felony-murder conviction, to be served consecutively to a term of two years' imprisonment for the felony-firearm conviction.[1]

In defendant's previous appeal, we described the facts of this case as follows:

Defendant was convicted for the shooting death of Jason Stanfield in the parking lot of the Fulton Heights Grocery Store in Grand Rapids on October 16, 1995. The prosecution argued that defendant shot Stanfield while he was attempting to rob him. The defense theory of the case was that there was a confrontation between defendant and Stanfield, and that after Stanfield attempted to hit defendant, defendant shot him. In order to establish that defendant intended to rob Stanfield, the prosecutor offered evidence of two prior robberies committed

---

[1] Defendant appealed these convictions, and a panel of this Court affirmed his first-degree felony murder and felony-firearm convictions and sentences. See *People v Clemons*, unpublished per curiam opinion of the Court of Appeals, issued January 23, 1998 (Docket No. 198611), pp 1, 3. Defendant does not challenge his sentence for felony-firearm conviction on appeal.

by defendant in the same area as the Fulton Heights Grocery Store. Additionally, David Nelson, an acquaintance of defendant, testified that defendant said on the day of the incident that he was going to rob someone.

Approximately 16 years after defendant started serving his sentence, the United States Supreme Court decided *Miller v Alabama*, 567 US 460, 465; 132 S Ct 2455; 183 L Ed 2d 407 (2012), and held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments." Following the *Miller* decision, the Michigan Legislature enacted MCL 769.25 and MCL 769.25a, which addressed life-without-parole sentences for juveniles and the option for imprisonment of a term of years. And in 2016, the United States Supreme Court in *Montgomery v Louisiana*, 577 US ___; 136 S Ct 718, 732, 736; 193 L Ed 2d 599 (2016), concluded that its holding in *Miller* constituted a substantive rule of constitutional law that was to be applied retroactively.

On the basis of *Miller*, *Montgomery*, and MCL 769.25a(3) and (4)(a), the Kent County Prosecuting Attorney moved to resentence defendant. In resentencing briefs, defendant argued in favor of a term-of-years sentence, and the prosecution argued in favor of a sentence of life imprisonment without parole. The resentencing judge ultimately resentenced defendant to life imprisonment without the possibility of parole.

On appeal, defendant first argues that the trial court abused its discretion by resentencing him to life imprisonment without parole and that the trial court erred by concluding that defendant's age and family and home environment were not mitigating factors. We disagree.

We review a trial court's sentencing decision under the traditional abuse-of-discretion standard. *People v Skinner*, 502 Mich 89, 131; 917 NW2d 292 (2018). "The trial court abuses its discretion when its decision falls outside the range of principled outcomes or when it erroneously interprets or applies the law." *People v Lane*, 308 Mich App 38, 51; 862 NW2d 446 (2014) (citation omitted). A sentence constitutes an abuse of discretion when the sentence violates the principle of proportionality, which requires that a sentence be proportionate to the seriousness of the circumstances of the offense and the offender. *Skinner*, 502 Mich at 131-132. This Court reviews the trial court's findings of fact for clear error. *Id*. at 137 n 27. " 'A decision is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made.' " *People v Hesch*, 278 Mich App 188, 192; 749 NW2d 267 (2008) (citation omitted).

"[M]andatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 US at 465. The *Miller* Court recognized that youthful attributes diminished the penological justifications for imposing life imprisonment without parole on juvenile offenders. *Id*. at 472. As described by the Michigan Supreme Court in *Skinner*,

> [t]he following are the factors listed in *Miller*: (1) "his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional"; (3) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures

may have affected him"; (4) whether "he might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and (5) "the possibility of rehabilitation . . . ." [*Skinner*, 502 Mich at 114-115, quoting *Miller*, 567 US at 477-478.]

The *Miller* factors are circumstances that mitigate the proportionality of a sentence of life imprisonment without parole for a juvenile offender. See *Miller*, 567 US at 489. The *Miller* Court noted that there was a difference between the crime of a juvenile offender that demonstrated the juvenile's transient immaturity and the crime of the "rare juvenile offender whose crime reflects irreparable corruption." *Id*. at 479-480. The *Miller* Court held that trial courts are required to consider how children are different and how those differences weigh against irrevocably sentencing them to a term of life imprisonment. *Id*.

Regarding the first *Miller* mitigating factor (defendant's chronological age and its hallmark features), defendant was 15 years old at the time of the offense. Defendant's criminal history of theft, assault, and drug-related offenses demonstrated defendant's impulsiveness and failure to appreciate consequences, which were attributes of youth. Additionally, there was evidence that defendant did not understand that a shot from a .22 caliber pistol could kill an individual, which demonstrated defendant's failure to appreciate consequences. Further, defendant's probation officer and corrections officer believed that defendant lacked the mental ability to understand his actions in the death of Stanfield. Dr. Randell Haugen evaluated defendant and testified that defendant's childhood abuse and limited intellectual functioning affected his ability to understand potential consequences of his behavior at the time of the homicide. Additionally, Dr. Haugen testified that defendant experienced childhood trauma, which could have impacted his brain development. This evidence supported considering defendant's age and characteristics of youth as mitigating factors. See *id*. at 471-472.

However, defendant committed many misconduct offenses during his (22 plus years) of incarceration, including 65 assault incidents, 16 property-related incidents, and 216 sexual misconducts. The misconducts occurred as recently as August 2018 and occurred after defendant was aware that he had an opportunity to be resentenced pursuant to *Miller*. Defendant's behavior while incarcerated supported that defendant's violent and concerning behaviors before and at the time of the offense were not related to defendant's youth but demonstrated defendant's general propensities. Additionally, Dr. Haugen testified that defendant experienced sexual, emotional, and physical abuse during his adolescent development that resulted in his "pattern of acting out and aggressive and hostile behaviors" to protect himself. Dr. Haugen testified that defendant's childhood abuse and his limited intellectual functioning affected his ability to understand potential consequences of his behavior at the time of the homicide and that defendant's fear, hypervigilance, paranoia, and limited capacity to cope became components of his personality. Therefore, defendant did not demonstrate that his behaviors and responses to Stanfield at the time of the offense were related to the attributes of his youth, rather than his responses as a result of his childhood trauma, limited intellectual functioning, and personality traits of fear, hypervigilance, and paranoia.

As to the second *Miller* factor (family and home environment), defendant's home environment was far from ideal. Jeanette Clemons, defendant's mother, had mental health concerns when defendant was an infant, and Jeanette experienced domestic violence and a rape, which defendant observed. Willie Toliver, defendant's father, had substance abuse issues that resulted in financial difficulties and in Toliver and defendant becoming homeless. Defendant committed self-injurious behavior, but he did not receive mental health treatment. Defendant lacked parental supervision and participated in a gang, sold drugs, and purchased and sold drugs for his stepfather. These experiences supported that defendant had a dysfunctional and violent home environment that affected defendant's culpability for the offense. See *id*. at 478-479. Although defendant moved from Jeanette's home and custody to Toliver's home and custody on several occasions, there was no evidence that defendant was able to extricate himself from the abusive and drug-influenced home environments with either Jeanette or Toliver.

Defendant was also vulnerable to negative influences and outside pressure. Defendant had a learning disability and was bullied at school. Defendant participated in fights at school and brought drugs to school when he was on probation. Defendant had a juvenile criminal history of possession of a gun, possession of drugs, failing to abide by a probation officer's commands, and probation violations. Additionally, defendant's probation officers testified that defendant was immature for his age and was a "follower." Therefore, defendant's family and home environments made him susceptible to negative and outside influences and could have affected his decision-making process at the time he committed the offense in this case. See *id*. at 476 (explaining that youth is a transient period when an individual is most susceptible to outside influences and psychological damage). As a result, the trial court clearly erred by determining that defendant's family and home environment was not a mitigating factor. See *id*. at 478-479; *Hesch*, 278 Mich App at 192.

Next, we consider the third *Miller* factor, the circumstances of the crime. Defendant was the only perpetrator involved in the offense and carried a loaded lethal weapon. Although defendant appeared to have the mistaken belief that a .22 caliber pistol could scare another person but would not kill the individual, defendant demonstrated a disregard for the possible consequence of death or serious injury. Defendant reported to Dr. Haugen that he felt challenged or threatened by Stanfield because Stanfield caught defendant's eye and attempted to hit him. However, the trial court found that defendant's version of the incident was inconsistent with an eyewitness account that Stanfield was not the aggressor and that defendant approached Stanfield, guided Stanfield around his car, and shot Stanfield after Stanfield asked defendant to leave him alone and pushed himself into defendant. Additionally, defendant committed similar acts of three armed robberies from September 23, 1995, to the time of the armed robbery and death of Stanfield on October 16, 1995. The circumstances of the crime were thus not a mitigating factor.

Addressing the fourth *Miller* factor, there was no evidence that defendant was influenced by peer or familial pressure to commit the crime in this case. Additionally, there was no evidence that defendant's age or incompetency of youth rendered him unable to interact with police officers or the prosecution or to assist in his defense. The fourth *Miller* factor was thus not a mitigating factor.

As to the fifth *Miller* factor, the possibility of rehabilitation, defendant's history of misconducts during his incarceration, including his threat to kill a corrections officer as he had

killed Stanfield, demonstrated that defendant's behavior and criminal activity escalated and weighed against the possibility of rehabilitation. Although Dr. Haugen testified that defendant could present a low risk to society by showing that he did not receive misconducts, participated in and benefited from mental health services, took prescribed medications, developed coping skills, and developed relationships in a less restrictive prison environment, Dr. Haugen testified that defendant needed to make these efforts for 7 to 10 years in order to show long-term rehabilitation. Therefore, defendant's possibility of rehabilitation was not a mitigating factor.

In sum, although defendant's family and home environment was a mitigating factor, the evidence and testimony regarding defendant's age, the circumstances of the homicide offense, defendant's ability to interact with police officers and attorneys, and the possibility of rehabilitation did not support that defendant's crime reflected his transient immaturity. See *Miller*, 567 US at 479-480. The trial court considered the *Miller* factors and applied the law to the facts of the case before imposing the sentence of life imprisonment without parole. The trial court's sentence was within the range of principled outcomes. We conclude that the trial court did not abuse its discretion in resentencing defendant to life imprisonment without parole. See *id*. at 477-478; *Skinner*, 502 Mich at 131, 133; *Lane*, 308 Mich App at 51.

Defendant next argues that defense counsel was ineffective for failing to present expert witness testimony regarding adolescent brain development and that trial court abused its discretion when it denied defendant's postjudgment request for funds to retain an expert in adolescent brain development. We disagree.

Defendant presents this issue as an ineffective assistance of counsel claim. However, defendant argues the substance of this issue as a challenge to the trial court's determinations regarding defendant's postjudgment ineffective assistance of counsel claims and ultimate denial of defendant's postjudgment motion to correct an invalid sentence. Therefore, we address the issue whether the trial court properly determined that defendant's sentence of life imprisonment without parole was valid by evaluating whether there was a legal or procedural error with defendant's *Miller* resentencing on the basis of defendant's ineffective assistance of counsel claims.

This Court reviews de novo whether a trial court exceeded its authority to set aside a sentence or whether a sentence is valid. See *People v Miles*, 454 Mich 90, 96-98; 559 NW2d 299 (1997); *People v Whalen*, 412 Mich 166, 169-171; 312 NW2d 638 (1981).

Generally, "[t]he question whether defense counsel performed ineffectively is a mixed question of law and fact; this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). Because the trial court denied defendant's claim of ineffective assistance of counsel and request for an evidentiary hearing, this Court's review is limited to mistakes apparent on the lower court record. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009).

"This Court reviews for abuse of discretion a trial court's decision whether to grant an indigent defendant's motion for the appointment of an expert witness." *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006). The trial court abuses its discretion when it chooses an outcome that falls outside the range of principled outcomes. *Id*. at 617.

Defendant moved the trial court for another resentencing hearing to correct an invalid sentence pursuant to MCR 7.208(B)(1), which provides that "[n]o later than 56 days after the commencement of the time for filing the defendant-appellant's brief as provided by MCR 7.212(A)(1)(a)(iii), the defendant may file in the trial court a motion for a new trial, for judgment of acquittal, to withdraw a plea, or to correct an invalid sentence." Under MCR 6.429(A), the trial court "may correct an invalid sentence . . . on motion by either party. But the court may not modify a valid sentence after it has been imposed except as provided by law." Regarding the timing of filing a motion to correct an invalid sentence, "[i]f a claim of appeal has been filed, a motion to correct an invalid sentence may . . . be filed in accordance with the procedure set forth in MCR 7.208(B) or the remand procedure set forth in MCR 7.211(C)(1)." MCR 6.429(B)(2). "[T]he trial court lacks authority to set aside a valid sentence once the defendant begins serving it." *People v Wybrecht*, 222 Mich App 160, 166; 564 NW2d 903 (1997). "[A]bsent a tangible legal or procedural error that makes a sentence invalid, the trial court cannot alter a sentence that a defendant has begun to serve." *Id*. at 167. The trial court denied defendant's motion to correct an invalid sentence and request for another resentencing hearing. However, defendant was able to continue with his appeal of right following a trial court's denial of the motion for resentencing pursuant to MCR 7.208(B)(6).

"Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). To overcome this presumption, a defendant must show that: (1) defense counsel's performance did not meet an objective standard of reasonableness under the circumstances and according to prevailing professional norms and (2) there was a reasonable probability that, but for defense counsel's errors, the results of the proceeding would be different. *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 312-313; 521 NW2d 797 (1994). Additionally, a defendant must show that the result that occurred was fundamentally unfair or unreliable. *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012).

"Defense counsel must be afforded broad discretion in the handling of cases." *Pickens*, 446 Mich at 325. Defense counsel's decision to abstain from presenting an expert witness can constitute a sound trial strategy. See *Payne*, 285 Mich App at 190. Further, how defense counsel questions a witness is also presumed to be a matter of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).

In this case, defendant did not demonstrate any legal or procedural error with his *Miller* resentencing hearing on the basis of his claim that defense counsel was ineffective for failing to present expert witness testimony regarding adolescent brain development. Defendant did not establish that defense counsel's performance fell below an objective standard of reasonableness. Defense counsel presented in defendant's resentencing memorandum two articles by Dr. Keating regarding the impact of early trauma on adolescent brain development and the implications for adolescent brain development science on the sentence of life imprisonment without parole for juvenile offenders. These articles provided summaries of scientific and clinical research regarding brain development, risk behavior associated with early life trauma, and the capacity for developmental growth and desistence from criminal activity, among other topics. Therefore, defense counsel presented the trial court with Dr. Keating's research regarding adolescent brain development and childhood trauma.

Defense counsel also presented Dr. Haugen's testimony regarding Dr. Keating's research. According to Dr. Haugen, trauma impacted the brain by enlarging the amygdala that controls the sense of danger and perceived threats, decreasing the hippocampus that controls memory consolidation, and improperly regulating the frontal cortex that results in overreactive or hypersensitive threats to safety and being on the alert for threats. Dr. Haugen also opined that this research was applicable to defendant and that defendant's environment in prison contributed to his development of negative behaviors and survival skills that were hostile and power-oriented for protection. Dr. Keating's research and Dr. Haugen's testimony served as evidence that defendant's brain was not fully developed at the time of the offense, particularly because of his childhood trauma, and sufficiently presented evidence to the trial court that defendant was less culpable and less deserving of a sentence of life imprisonment without parole because of his characteristics of youth. Defense counsel's decision to select Dr. Haugen as an expert witness and to question Dr. Haugen regarding Dr. Keating's research, rather than selecting Dr. Keating as an expert, was a matter of trial strategy. See *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015).

Additionally, defense counsel presented the testimony of Dr. Haugen that defendant's childhood trauma during his development, his low intellectual functioning, and his incarceration resulted in his fear, hypervigilance, paranoia, and limited capacity to cope becoming a part of his personality. Dr. Haugen testified that defendant was treatable and that he could show that he would not be a risk to society if he demonstrated that he was capable of long-term rehabilitation. Dr. Haugen's testimony thus favored defendant and demonstrated that: Dr. Keating's research was applicable to defendant; defendant was less culpable because of his underdeveloped brain and his learned responses to his childhood trauma, and; defendant was capable of being rehabilitated. The trial strategy of selecting Dr. Haugen as an expert witness, rather than Dr. Keating, allowed defense counsel to introduce Dr. Keating's research and to discuss the applicability of Dr. Keating's research to defendant on the basis of an in-person psychological evaluation of defendant. See *id*.

Furthermore, defendant did not demonstrate that the results of the proceedings would have been different had Dr. Keating testified. Defendant did not argue or present any evidence to support that Dr. Keating would have testified regarding additional information related to adolescent brain defendant and a juvenile's culpability beyond what was provided in the research articles. As previously indicated, there was evidence that supported that defendant's crime and behavior was not the product of youthful attributes and that defendant was not able to be rehabilitated. The evidence and testimony supported the trial court's conclusions absent Dr. Keating's testimony, and defendant did not show that a different sentence was reasonably probable had Dr. Keating testified. Defendant thus did not establish the requisite prejudice for his ineffective assistance of counsel claim. See *Strickland*, 466 US at 687-688; *Pickens*, 446 Mich at 312-313. Because it is not apparent from the record that defense counsel erred, the trial court did not err by determining that defendant's sentence was not invalid and by denying defendant's request for another resentencing hearing. See *Miles*, 454 Mich 90, 96-98; *Whalen*, 412 Mich at 169-171.

Defendant also argues that he should have been granted postjudgment funds to consult with an expert in adolescent brain development and the effects of childhood trauma, such as Dr. Keating, in order to support defendant's postjudgment ineffective assistance of counsel claim. Again, defendant did not demonstrate that there was a reasonable probability that Dr. Keating's testimony would have assisted defendant during the resentencing or motion hearings. Defendant

also failed to demonstrate that the denial of his request for funds to retain Dr. Keating resulted in a fundamentally unfair resentencing. The trial court granted defendant's request for expert witness funds to retain Dr. Haugen. Dr. Haugen's testimony incorporated Dr. Keating's research and discussed his psychological evaluation of defendant, and defendant did not argue or demonstrate that Dr. Keating would have testified regarding additional information related to adolescent brain defendant and a juvenile's culpability beyond what was provided in his research articles. Although defendant argued that defense counsel requested funds for an expert in the *Miller* mitigating factors before his resentencing hearing, there is no indication in the lower court record that defense counsel made such a request or that the trial court would have denied defense counsel's request for funds to retain Dr. Keating had defense counsel made that request. Additionally, the testimony and evidence presented during the resentencing hearing supported the trial court's sentence of life imprisonment without parole, and there was no indication that Dr. Keating's testimony would have affected the trial court's sentence. Defendant presented expert testimony regarding his childhood trauma and adolescent brain development, and defendant did not demonstrate that the absence of Dr. Keating's testimony resulted in a fundamentally unfair resentencing hearing. For the same reasons, defendant did not demonstrate that the absence of Dr. Keating's testimony during the postjudgment motion hearing resulted in a fundamentally unfair motion hearing. Therefore, the trial court did not abuse its discretion by denying defendant's request for expert witness funds. See *Carnicom*, 272 Mich App at 616.

Defendant next argues that the sentence of life imprisonment without parole for a juvenile offender violates the United States and Michigan Constitutions prohibitions on cruel and unusual punishments. We disagree.

The Michigan Supreme Court in *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014), vacated on other grounds by *Montgomery*, 577 US at ___, examined the federal and Michigan tests to determine whether the sentence of life imprisonment without parole was disproportionate to a juvenile offender. In discussing the gravity of the offense and the severity of the sentence, the *Carp* Court determined that first-degree murder "is almost certainly the gravest and most serious offense that an individual can commit under the laws of Michigan—the premeditated taking of an innocent human life" and that the most severe punishment authorized by the laws of Michigan did not support an inference of gross disproportionality. *Carp*, 496 Mich at 514-515. However, because the threshold comparison of the gravity of the offense and the severity of the sentence did not lead to an inference of gross disproportionality, the *Carp* Court determined that the Eighth Amendment did not categorically ban the sentence of life without parole for a juvenile offender. *Id*. at 515.

The *Carp* Court explained that the first three parts of the Michigan test for proportionality bore a "considerable resemblance" to the federal proportionality test. *Id*. at 520. The *Carp* Court determined that its conclusion that the first three factors did not support the inference that a sentence of life imprisonment without parole for a juvenile offender was disproportionate under the Eighth Amendment was applicable to the first three factors of the Michigan test. *Id*. The *Carp* Court also determined that a sentence of life imprisonment without parole does not serve the penological goal of rehabilitation because " '[t]he penalty forswears altogether the rehabilitative ideal.' " *Id*. at 521. However, the *Carp* Court concluded that the sentence of life imprisonment without parole for a juvenile was not unconstitutional as cruel or unusual punishment under the

Michigan Constitution when only one of the four factors supported the conclusion that the sentence was disproportionate. *Id*. Based on *Carp*, defendant's argument on this issue fails.

Finally, defendant argues that the sentence of life imprisonment without parole for a juvenile offender with an intellectual disability violates the United States and Michigan Constitutions prohibitions on cruel and unusual punishments. We decline to address this issue because defendant has not met the factual predicate to demonstrate that such a categorical ban would apply to him. The issue whether defendant had an intellectual disability was not addressed or decided during defendant's trial or during the resentencing hearing. Several witnesses testified that defendant had intellectual impairments, and Dr. Haugen concluded after his evaluation of defendant that defendant had a mild intellectual disability. However, there was no analysis by the trial court whether an intellectual disability affected defendant's culpability. We conclude that this case does not present an appropriate factual predicate to decide this issue. See *People v Cain*, 498 Mich 108, 117 n 4; 869 NW2d 829 (2015); *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993) ("[T]here exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case.").

Affirmed.

/s/ Karen M. Fort Hood
/s/ David H. Sawyer
/s/ Deborah A. Servitto